COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Russell and AtLee
Argued at Richmond, Virginia


NHC HEALTHCARE/BRISTOL, LLC

MEMORANDUM OPINION[*] BY
v.        Record No. 1082-16-2        JUDGE WESLEY G. RUSSELL, JR.
JANUARY 10, 2017

MARISSA J. LEVINE, MD, MPH,
 VIRGINIA STATE HEALTH COMMISSIONER, AND
 BRISTOL HCP, LLC


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins, Jr., Judge

Jonathan M. Joseph (Harrison M. Gates; Christian & Barton, L.L.P.,
on briefs), for appellant.

Sean J. Murphy, Assistant Attorney General (Mark R. Herring,
Attorney General; Cynthia V. Bailey, Deputy Attorney General;
Allyson K. Tysinger, Chief/Senior Assistant Attorney General, on
brief), for appellee Marissa J. Levine, MD, MPH, Virginia State
Health Commissioner.

Matthew M. Cobb (Martin A. Donlan, Jr.; Williams Mullen, on
brief), for appellee Bristol HCP, LLC.


NHC Healthcare/Bristol, LLC ("NHC"), appellant, appeals an order of the circuit court

affirming a case decision of appellee Dr. Marissa J. Levine, the State Health Commissioner.

Specifically, Commissioner Levine denied NHC's petition seeking good cause standing status as

defined in Code § 32.1-102.6(G). Such status would have permitted NHC to participate in the

proceedings before the Commissioner on an application of Bristol HCP, LLC ("HCP") for a

certificate under Virginia's Medical Care Facilities Certificate of Public Need Law, Code

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

§§ 32.1-102.1 *et seq.* ("COPN law"), for the construction of a ninety-bed nursing home in Bristol, Virginia. Finding no error, we affirm.

BACKGROUND

HCP seeks to build a ninety-bed nursing home as part of a larger development in Bristol, Virginia. In addition to its nursing home component, the development also will house an assisted living community. The entire development will be located in Planning District 3. The proposed nursing home is to be named Carrington Place at Bristol ("CPB").

Consistent with the COPN law, HCP, on December 30, 2014, filed with the State Health Commissioner notice of its intent to file a Certificate of Public Need application related to the development. On January 29, 2015, HCP submitted its application to the Division of Certificate of Public Need ("Division") to construct the facility. As submitted, the application was for "the development of a nursing home in Bristol, Virginia through the relocation of 90 nursing home beds from two existing nursing homes in Wytheville, Virginia in Planning District 3." As designated in the application, "[t]he primary service area of CPB will be the City of Bristol and Washington County, Virginia[, and t]he secondary service area will be the area within a 30 minute drive time of CPB including parts of Tennessee not within Bristol or Washington County."

Prior to submitting its application, HCP entered into forbearance agreements with the owners and operators of the two Wytheville facilities, whereby one would delicense thirty licensed nursing home beds while the other would delicense all of its sixty licensed nursing home beds upon HCP receiving the requested COPN.

Consistent with the statutory scheme, the application sought review only of construction of the nursing home/relocation of the nursing home beds within Planning District 3. The assisted living portion of the development is not subject to the COPN process.

Upon its review of the application for completeness, the Division determined the "Financial Data" section of the application did not include a completed "estimated capital costs" portion. HCP filed its response on March 4, 2015, listing a total of $2,586,158 in site acquisition and preparation costs, $9,044,801 for direct construction costs, $1,500,000 for additional equipment, and $273,000 in architectural and engineering fees, thereby resulting in total estimated capital costs of $13,403,959. On March 9, 2015, HCP submitted a revised capital costs form indicating construction costs of $8,642,271, thus reducing the total capital costs to $13,001,429. There was e-mail communication between the Division and HCP noting the discrepancy and addressing the financing of the costs, and HCP again submitted a revised form on April 16, 2015.

Consistent with the requirements of Code § 32.1-102.6(B), a public hearing was held on HCP's COPN application on April 17, 2015. Witnesses spoke both for and against the granting of the application, and the Division received letters and other submissions both before and after the public hearing. According to the Division, "[t]he accounts provided at the public hearing mirror the letters of support and opposition submitted . . . ." The opponents included several potential competitors of HCP's proposed facility, including NHC, Commonwealth Care of Roanoke, Abingdon Health & Rehab Center, and Grace Healthcare of Abingdon.

Some of the more detailed objections were made by Frank Peck, an expert who provided information on behalf of Commonwealth Care of Roanoke.[1] Among other things, Mr. Peck noted that the capital costs stated in the application did not include information regarding both financing costs and the costs associated with the forbearance agreements with the facilities that

_____

[1] Although not formally NHC's expert, NHC adopted some of Mr. Peck's positions as their own during the litigation. Specifically, in its petition for good cause standing, NHC stated that "[n]o exhibits are being submitted with this petition as this petition is a duplicate of that being submitted on behalf of Abingdon Health [&] Rehab Center and Grace Healthcare of Abingdon. We therefore adopt and incorporate by reference the exhibits submitted with [that] petition." That petition, in turn, included exhibits setting forth the qualifications and opinions of Mr. Peck.

had agreed to delicense nursing home beds if HCP were granted a certificate for the project. Of particular note, Mr. Peck wrote that "HCP's COPN application does not demonstrate the proposed project has the ability to fund the *total disclosed $13,001,429 capital cost to complete the project* and does not include the value of undisclosed necessary costs that HCP has incurred or will incur." (Emphasis added). Based on these and other costs-based omissions, Mr. Peck concluded that "[t]he project is not financially feasible."

Thus, prior to the issuance of the Division's staff report, the objection regarding capital costs was that the figure contained in the application *understated* the costs of the reviewable project; based on the record provided to us, no participant in the public hearing argued that the application should be denied because the actual capital costs were less than the stated $13,001,429.

On April 28, 2015, the management company for the project wrote a letter addressing some of the comments and objections that had been raised. On May 15, 2015, HCP requested that the Division delay its review of the COPN application to allow it to file additional information. On June 12, 2015, HCP filed a memorandum indicating that it had revised its application in light of objections that had been raised, with particular reference to the criticisms put forth by Mr. Peck. HCP explained "that it had included its assisted living units' capital costs in its nursing home capital costs [and] has restated its capital costs to account for this mistake . . . ." The application was amended further to "include the forbearance agreement payment as a capital cost." The changes were set forth in attached exhibits, as were funding letters establishing the availability of equity contributions and an amortization schedule.

As a result of the additions and corrections, the stated total capital costs were reduced to $12,126,946. This figure was $1,377,013 less than the capital costs put forward in the initial

- 4 -

application and $874,483 less than the amount presented in March, which was the number available for discussion at the time of the public hearing.

Specifically, the additions to the capital costs (*e.g.*, the costs of the forbearance agreements) increased the projected capital costs by almost $2,400,000, while the deduction of the mistakenly included costs associated with the development's assisted living component reduced capital costs by slightly more than $3,200,000. Thus, the restated capital costs represented roughly a net 6.7% *reduction* in capital costs from the figure that had been utilized by the parties at the time of the public hearing.

In a June 12, 2015 memorandum, HCP stated "that a reduction in costs is not a significant change amendment under COPN regulations." With the changes, the application, as revised, was reactivated.

On July 31, 2015, the Division issued its staff report regarding the project. The Division determined that the project would not increase the number of beds in Planning District 3, that the projected capital costs totaled $12,126,946 (the revised amount estimated by HCP), and that "the proposed project will introduce greater operating efficiency and services for the residents of P[lanning] D[istrict] 3." In setting forth the bases for its conclusions, the Division detailed the occupancy rates for licensed nursing home beds at facilities that were operating in Planning District 3 and took note of the potential population imbalance that HCP had noted within the district, *i.e.*, that the nursing home age population of Planning District 3 was concentrated more heavily where the proposed facility was being built than where the beds were to be delicensed. The Division noted that

> [t]he purpose of this project is not to foster institutional competition but rather to respond to existing and projected patient demand, increase operating efficiency with a more up to date facility and the ability to offer more patient privacy through private rooms and respond to the "culture of change" in the nursing home paradigm. Given the number and distribution of nursing home

- 5 -

facilities in P[lanning] D[istrict] 3 and no new proposed beds with this project, it is unlikely that the proposed project will significantly increase institutional competition.

The Division concluded that "the relocation of existing beds to Bristol, within minutes of major transportation thoroughfares of Route 11 and Interstate 81, will be of benefit to both the residents of Bristol and Washington County, as well as the residents outside of those jurisdictions but within a 30 minute travel time to" the new facility and that "approval of the proposed project would improve the utilization and efficiency of nursing services in P[lanning] D[istrict] 3."

Having detailed its review and considerations in the report, the Division recommended approval, specifically stating the following bases:

l. The proposed establishment of a 90 bed nursing facility through the relocation of 90 nursing home beds *is in general compliance with the relevant criteria/standards of the State Medical Facilities Plan and the 8 Required Considerations of the Code of Virginia.*

2. The capital cost of the proposed project is reasonable.

3. The proposed project appears economically viable in the immediate and long-term.

4. The proposed project is not likely to have a significant negative impact on the *utilization*, cost, or charges of other P[lanning] D[istrict] 3 providers of nursing home care.

5. There are no reasonable less costly or more efficient alternatives to the proposed project.

(Emphasis added).

Opponents of the project objected to the Division's recommendation. Abingdon Health & Rehab Center, Grace Healthcare of Abingdon, and NHC filed petitions, pursuant to Code § 32.1-102.6, seeking good cause standing status to allow them to participate in the Commissioner's review of the application. NHC described its petition as "a duplicate of that being submitted on behalf of Abingdon Health [&] Rehab Center and Grace Healthcare of

Abingdon."[2]  In its petition, NHC asserted several reasons for its belief that it was entitled to good cause standing.  First, it argued that it was entitled to such status "because there is significant relevant information about the . . . [p]roject that was not previously presented at and not available at the time of the public hearing."  In support of its allegation, NHC cited the changes HCP made to its application before and after the public hearing, particularly with respect to the projected capital costs, and argued that it had "good cause to participate as a party to the case because there is significant information relevant to the credibility and feasibility of . . . HCP's estimated capital costs not previously presented at and not available at the time of the public hearing."  Appellant additionally claimed that it was entitled to good cause standing because the Division report "contains multiple substantial material mistakes of law," arguing that the change in projected costs constituted an amendment involving a "significant change" requiring that it be treated as a new application.  Appellant alleged:  "[the Division's] failure to consider . . . HCP's substantial amendments to its COPN application as constituting a new application subject to all review requirements, including a new public hearing; is a substantial material mistake of law and sufficient to grant NHC good cause standing."  Next, NHC asserted it was entitled to good cause standing because the Division made material mistakes of fact in its report, to include its assessment of occupancy rates, capital costs, and the impact on competition.  Finally, appellant sought good cause standing due to alleged "significant changes in factors or circumstances relating to the application subsequent to the public hearing," specifically the status of  HCP's purchase contract.

HCP filed its response to the petitions for good cause standing on August 17, 2015.  It averred that petitioners "offer[ed] no evidence that the current capital costs are insufficient to build the project."  It further argued that the reduction in the estimated capital costs did not constitute a

---

[2] Abingdon Health & Rehab Center and Grace Healthcare of Abingdon each sought good cause standing status in the same petition.

"significant change." HCP responded to petitioners' allegations regarding alleged mistakes of fact and law by the Division, essentially arguing that the Division correctly had found the facts and applied the appropriate legal standards.

An informal fact finding conference in which the good cause standing petitions were raised was held on August 17, 2015. After the informal fact finding conference, both HCP and the petitioners submitted additional written argument and proposed findings of fact and conclusions of law. On October 2, 2015, the adjudication officer issued his written recommendation that the Commissioner deny the petitions for good cause standing. On October 30, 2015, the Commissioner denied the petitions. In setting forth her conclusion that the petitioners failed to show good cause, she attached and incorporated the adjudication officer's written recommendation related to the petitions. As a result of the Commissioner's denial, the petitioners did not become parties to the proceeding. On November 12, 2015, the Commissioner approved HCP's application for a COPN.

NHC appealed the Commissioner's good cause standing decision to the circuit court, which affirmed the Commissioner's decision and dismissed the appeal by order entered June 1, 2016.[3] This appeal followed, in which appellant presents the following assignments of error:

> I. The circuit court erred in affirming the Commissioner's case decision because Bristol HCP's addition of nearly $2.4 million in new capital costs to the proposed nursing home project in its June 12, 2015 submission constituted "significant relevant information" not previously presented at and not available at the time of the public hearing.

> II. The circuit court erred in affirming the Commissioner's case decision because the DCOPN's staff report contains a substantial material error of law in that Bristol HCP's addition of nearly $2.4 million in new capital costs to the proposed nursing home project in its June 12, 2015 submission constituted an "amendment" to the application that should have restarted the COPN review process.

---

[3] Abingdon Health & Rehab Center and Grace Healthcare of Abingdon did not seek review of the Commissioner's denial of their good cause petition.

III. The circuit court erred in affirming the Commissioner's case decision because the DCOPN's staff report contains a substantial material error of law in that the DCOPN did not apply the utilization and occupancy criteria mandated by Va. Code § 32.1-102.3.

## STANDARD OF REVIEW

NHC asserts that its appeal presents questions of statutory interpretation. Questions of statutory interpretation are pure matters of law that are reviewed *de novo*. Syed v. ZH Techs., Inc., 280 Va. 58, 69, 694 S.E.2d 625, 631 (2010). Nevertheless, "when the statute is obscure or its meaning doubtful . . . courts [will] defer to an administrative interpretation. In such circumstances . . . courts will generally give great weight to the administrative interpretations of statutory provisions." Davenport v. Little-Bowser, 269 Va. 546, 555, 611 S.E.2d 366, 371 (2005). Although "the doctrine of administrative interpretation will not be allowed to change the plain meaning of the statute," Commonwealth v. Appalachian Electric Power Co., 193 Va. 37, 45, 68 S.E.2d 122, 126-27 (1951) (quoting Superior Steel Corp. v. Commonwealth, 147 Va. 202, 206, 136 S.E. 666, 667 (1927)), appellate courts recognize

> that the practical construction given to a statute by public officials charged with its enforcement is entitled to great weight by the courts and in doubtful cases will be regarded as decisive. The Legislature is presumed to be cognizant of such construction and when long continued, in the absence of legislation evincing a dissent, the courts will adopt that interpretation.

Id. at 45-46, 68 S.E.2d at 127. Such deference to an agency's interpretation is at its apex when the interpretation has been adopted and promulgated by way of a regulation because "an agency's interpretation of its governing statutes, as reflected in its regulations, is entitled to great weight." Manassas Autocars, Inc. v. Couch, 274 Va. 82, 87, 645 S.E.2d 443, 445 (2007); see also Moore v. Brown, 63 Va. App. 375, 380, 758 S.E.2d 68, 71 (2014) ("We afford great deference to administrative agencies in their interpretation of their own regulations."). Finally, we previously have recognized that the Commissioner's conclusion that the facts of a particular

- 9 -

case do not support a finding of good cause standing "may be reversed only if we find that those findings were unreasonable." Tidewater Psychiatric Inst., Inc. v. Buttery, 8 Va. App. 380, 386, 382 S.E.2d 288, 291 (1989); see also Chippenham & Johnston-Willis Hosps., Inc. v. Peterson, 36 Va. App. 469, 480, 553 S.E.2d 133, 138 (2001) (noting that we may "reverse the good cause determination only if we conclude [it was] arbitrary and capricious . . . or [is based on] findings of fact [that] were not supported by substantial evidence").

ANALYSIS

The COPN law requires the owners or sponsors of medical care facility projects to secure a certificate of public need from the State Health Commissioner prior to initiating such projects. Code § 32.1-102.3. The process for the filing and review of a COPN application is set forth in Code § 32.1-102.6. After an application has been filed, but before the Commissioner can act on it, the application is subject to a public hearing. Code § 32.1-102.6(B). In addition to the public hearing requirement, applications are subject to review by the Division, which provides recommendations to the Commissioner, who is charged with making, subject to appellate review, the ultimate decision on the application.

In addition to the applicant, others may participate in the process. Others are free to participate at the public hearing, but such participation does not make them parties to the ultimate proceedings before the Commissioner. However, Code § 32.1-102.6 permits non-applicants to become parties to the proceedings before the Commissioner if they file an appropriate petition and establish entitlement to good cause standing status. To obtain good cause standing status, a petitioner must establish "good cause," which means

> that (i) there is significant relevant information not previously presented at and not available at the time of the public hearing, (ii) there have been significant changes in factors or circumstances relating to the application subsequent to the public hearing, or (iii) there is a substantial material mistake of fact or law in the

> Department staff's report on the application or in the report
> submitted by the health planning agency.

Code § 32.1-102.6(G); see also Buttery, 8 Va. App. at 384, 382 S.E.2d at 290 ("'Good cause' may be found only if the person seeking admission to the litigation can prove the existence of one of three conditions enumerated in the statute: the exclusion of significant relevant information, a significant change in the factors or circumstances relating to the application, or a mistake of fact or law in the staff report or report of the health system agency.").

If the Commissioner determines that a petitioner has established "good cause," the petitioner becomes a party to the proceedings before the Commissioner; if not, the petitioner may not participate in or challenge the Commissioner's ultimate decision on the application. Id. at 384, 382 S.E.2d at 290 (holding that a party denied good cause standing status "is not a party to and may not appeal the substantive issues of the case").

Here, the Commissioner found that NHC failed to establish "good cause." Accordingly, the issue before us is limited to whether the Commissioner erred in making that finding.

I. Change in Capital Costs as Significant Relevant Information not Previously Presented at and not Available at the Time of the Public Hearing

NHC first argues that it was entitled to good cause standing because the change in capital costs from the time of the public hearing represented "significant relevant information" that was neither presented nor available for discussion at the public hearing. Although the revised capital costs figure was neither presented nor available at the public hearing, the Commissioner did not err in concluding that the change did not constitute "significant relevant information."

As noted above, Code § 32.1-102.6(G)(i) provides that a litigant can establish "good cause" by showing that "there is *significant* relevant information not previously presented at and not available at the time of the public hearing." (Emphasis added). By including the modifier "significant," the General Assembly signaled that it is not enough to show that there is new or

- 11 -

different information; "good cause" requires that the new or different information be "significant."[4]

In the context applicable here, <u>Webster's Third New International Dictionary</u> 2116 (3d ed. 1981), defines "significant" as "having meaning . . . full of import [and] having or likely to have influence or effect . . . ." Thus, to establish an entitlement to good cause standing status on the basis of the change in capital costs, NHC had to demonstrate that the change in capital costs was "full of import" or "likely to have influence or effect" on the decision whether to grant HCP a COPN.

Here, the Commissioner adopted the adjudication officer's report, which determined that the nearly $1,000,000 reduction in capital costs from the figure that was subject to comment at the public hearing to the actual figure at the time of the Division's review did not constitute "significant relevant information." Although the phrase "significant relevant information" is not defined in either the Code or the implementing regulations, the adjudication officer analogized it to a phrase, "significant change" that is defined in the implementing regulations.[5] Specifically, the adjudication officer reasoned that

> [a] reduction in the proposed capital costs for a project does not constitute a significant change to the project under the COPN regulations. Since the State Board of Health did not specify that a *reduction* in capital costs would be considered a significant change, when it readily could have, and, in fact, specified in regulation that an *increase* in capital costs would be a significant change, it is presumed to have not included reductions purposefully, using the legal canon of interpretation that holds that the express mention of one thing excludes all others.

---

[4] NHC has not identified any way in which the change in information is "significant" other than the size of the difference.

[5] The regulatory definition of "significant change" is discussed in detail in Section II below.

- 12 -

This conclusion is wholly consistent with our prior cases.  Specifically, in a case where a party seeking good cause standing argued that a purported increase in capital costs of less than 10% constituted "significant relevant information," we held that

> the commissioner did not abuse his discretion in finding that the [purported increase in costs] was not significant relevant information within the meaning of the statute.  The Health Department COPN regulations define significant changes as those that involve differences of ten percent or more from the original application.

Buttery, 8 Va. App. at 385, 382 S.E.2d at 291.[6]

Thus, the Commissioner did not err in concluding the change in estimated capital costs did not represent "significant relevant information," for the purposes of good cause standing. Accordingly, the circuit court did not err in affirming the Commissioner's decision in this regard.

II. Alleged Substantial Material Error of Law in Failing to Treat Change in Capital Costs as an Amendment to the Application

NHC next argues that the change in capital costs from the time of public hearing was of such a degree as to constitute an amendment to HCP's application.  NHC contends that the Division's staff report's failure to conclude that the change "constituted an 'amendment' to the application that should have restarted the COPN review process" is a substantial material error of law entitling it to good cause standing under Code § 32.1-102.6(G)(iii).

---

[6] This is not to say that a reduction in capital costs could never constitute significant relevant information, but rather, in the context of this case and other cases we have reviewed, such reductions did not constitute significant relevant information.  Here, the objections to capital costs at the public hearing were two-fold:  (1) the capital costs identified in the application did not include necessary components (*e.g.*, the cost of the forbearance agreements) and (2) adding these missing costs to the total identified in the application led opponents to assert that "[t]he project is not financially feasible."  Given that NHC concedes that the capital costs at the public hearing erroneously included more than $3,000,000 in costs associated with the assisted living portion of the development, the change in information makes it *more* likely that the nursing home will be financially feasible.  In short, in the context of the objections raised at the public hearing in this case, the change in information weakens the objection that had been made related to capital costs.

Consistent with its authority to promulgate regulations regarding the operation of the COPN law,[7] the Department of Health has defined an "amendment" to a COPN application as

> any modification to an application that is made following the public hearing and prior to the issuance of a certificate and includes those factors that *constitute a significant change as defined in this chapter*. An amendment shall not include a modification to an application that serves to reduce the scope of a project.

12 VAC 5-220-10 (emphasis added). As pertinent to NHC's appeal, the Department, in turn, defines "significant change" as "any alteration, modification or adjustment to a reviewable project for which a certificate of public need has been issued or requested following the public hearing which . . . [i]ncreases the capital expenditure amount authorized by the commissioner on the certificate of public need issued for the project by 10% or more . . . ." 12 VAC 5-220-10.

The Commissioner adopted the conclusion of the adjudication officer that the revised capital cost figure did not constitute a significant change as defined in 12 VAC 5-220-10, and hence, did not constitute an amendment. In reaching this conclusion, the adjudication officer determined that the estimated capital costs at the time of the public hearing were $13,001,429 and that, consistent with the Division's staff report, the actual capital costs of the project were $12,126,946. Given these figures, the adjudication officer concluded that the change in estimated capital costs did not constitute an amendment and that the Division's "staff report does not contain a substantial material mistake of law" because "rather than being 10 percent or more of the original figure, [the final capital costs are] demonstrably less than the original figure."

---

[7] NHC challenges neither the authority of the Department of Health to have enacted the regulations nor the content of the regulations adopted. Rather, NHC's argument is limited to the manner in which the Commissioner interpreted and applied the regulations at issue. We note the regulations at issue are longstanding and, for all practical purposes relevant here, have remained the same for more than thirty years.

Obviously, $12,126,946 is less than $13,001,429, and therefore, the adjudication officer correctly concluded that there had been no increase, let alone a 10% increase, in capital costs from the time of the public hearing until the proceedings before the Commissioner. Recognizing this, NHC argues that the comparison should not be between the revised figure and the costs estimated at the time of the public hearing, but rather, the revised figure must be compared "to the *actual* capital costs for the *reviewable project*—here, the 90-bed nursing home—to determine whether an amendment has occurred." (First emphasis added).

NHC bases its argument on the fact that the regulatory definition of "significant change" references "project" instead of application. See 12 VAC 5-220-10 ("'Significant change' means any alteration, modification or adjustment to a reviewable project . . . ."). Such a construction ignores context and other language contained within the COPN scheme, our prior interpretations of the relevant provisions, and leads to absurd results.

While, as noted above, the regulations do define "significant change" in terms of changes to a "project," common sense and context require reading the definition as changes from the information provided in the application for the "project" as of the time of the public hearing. This reading is compelled by the operative definition of "amendment," necessarily relied upon by NHC, which is "any modification to an *application* that is *made following the public hearing and prior to the issuance of a certificate* and includes those factors that constitute *a significant change as defined in this chapter*." 12 VAC 5-220-10 (emphasis added). Thus, as pertinent to this assignment of error, the definition of "significant change" only is relevant to determining whether the change represents an amendment of the application. In other words, the definition of "significant change" is a constituent part of the definition of "amendment," necessitating reading the terms together. Cf. Reston Hosp. Ctr., LLC v. Remley, 59 Va. App. 96, 106, 717 S.E.2d 417, 423 (2011) (holding that, in interpreting a part of a regulatory scheme, we review the entire

scheme to ensure that the various provisions work together to obtain the overall objective). Doing so, the only logical conclusion is that the significance of a change in information is measured by how much the information differs from the information provided in the application and that is discussed at the public hearing.

This reading of "significant change" finds further support in the statutory language defining good cause standing, which provides for such standing when relevant information was neither "presented" nor "available *at the time of the public hearing*." Code § 32.1-102.6(G) (emphasis added). Thus, the statute assumes that the change is from the information that the applicant provided in the application for the project and that was subject to comment at the public hearing—no other reading makes sense.

Furthermore, the Commissioner's interpretation is consistent with the prior decisions of this Court. Specifically, we previously have held that the relevant COPN "regulations define significant changes as those that involve differences of ten percent or more *from the original application.*" Buttery, 8 Va. App. at 385, 382 S.E.2d at 291 (emphasis added). Because the subject statutes and regulations have not changed in any relevant way in the interim, it was not error for the Commissioner to interpret the applicable language consistently with our interpretation in Buttery.

Although the Commissioner's conclusion is amply supported by both the language of the regulatory scheme as a whole and by our decision in Buttery, we note that the interpretation championed by NHC leads to absurd results and, in any event, would not result in a finding of good cause standing were it to be adopted. Under NHC's interpretation, the Division would be required to ignore the estimate of capital costs that had been included in the application and subject to comment at the public hearing and make an independent determination of "the *actual* capital costs for the *reviewable project*." NHC then argues that this required the Division to

- 16 -

subtract out the costs of the assisted living facility that were erroneously included in the estimate of capital costs stated in the application, reducing the capital costs of the project by slightly more than $3,200,000. Subtracting that figure from the figure in the application would result in capital costs of $9,758,571. Thus, argues NHC, there was a significant change because the Division's ultimate determination that the capital costs would be $12,126,946 represents a nearly 25% increase over the $9,758,571 figure.

However, if, as NHC contends, the Division was not bound by figures in the application and was required to determine the "actual cost" of the project, the Division could not stop with simply subtracting out costs that were erroneously included. Necessarily, it also would have to add in costs that had been erroneously omitted. Thus, the Division would have been required to add in the almost $2,400,000 in costs associated with the forbearance agreements that even NHC agrees should have been included as capital costs. If that calculation is performed, the "actual cost" of the project would be $12,126,946, which, of course, is what the Division ultimately determined the actual capital costs of the project to be. Thus, if the final figure is to be measured against the "actual cost" as determined by the Division, there was no increase (or decrease) in actual costs, let alone an increase meeting the 10% threshold.

This is not mere happenstance. NHC concedes, "[t]he 'project' always was the 90-bed nursing home facility, the scope of which never decreased," and thus, by definition, the *actual* costs always were the same. In cases like this one where the scope of the project does not change, NHC's interpretation would result in there *never* being a situation in which there would be an increase in capital costs because the number that the Division determines at the end of the process will always match the number that should have been provided at the beginning. This would lead to an absurd result: the regulatory provision regarding increased capital costs would be rendered meaningless in such cases. Accordingly, we reject NHC's formulation and continue

to adhere to our view that the appropriate comparison is between the final cost figure and the figure that was presented and discussed at the public hearing.

For the foregoing reasons, the circuit court did not err in affirming the Commissioner's decision in this regard.

III. Alleged Substantial Material Error of Law Related to Application of Utilization Review Criteria

Code § 32.1-102.3(B) sets forth eight criteria that the Commissioner "shall consider" when "determining whether a public need for a project has been demonstrated." Among the eight criteria, the Commissioner is required to consider "[t]he relationship of the project to the existing health care system of the area to be served, including the utilization and efficiency of existing services or facilities . . . ." Code § 32.1-102.3(B)(5). NHC's final challenge to the Commissioner's good cause standing decision asserts that the Division's staff report contains a substantial material error of law in that it fails to "apply the utilization and occupancy criteria" as specified in Code § 32.1-102.3(B)(5). We disagree with NHC.

At the outset, we note that NHC has not been consistent in how it has framed its claim to good cause standing based on the alleged failure of the Division to consider utilization and occupancy criteria. At present, it argues that the alleged failure constitutes a "substantial material error of law;" however, in its petition for good cause standing filed in the proceedings below it characterized it as a "substantial material mistake of fact."

Although this change in characterization raises significant questions of whether or not this issue is properly before us, Doe v. Va. Bd. of Dentistry, 52 Va. App. 166, 176, 662 S.E.2d 99, 104 (2008) (*en banc*) (holding that arguments not raised in the proceedings before the agency are procedurally defaulted on appeal), we believe that NHC's argument consistently has hinged on whether the Division considered utilization of existing facilities in rendering its

- 18 -

report. Accordingly, we will assume without deciding that the issue is sufficiently preserved to allow our appellate review.

It is important to recognize that NHC assigns error to the Division's "fail[ure] to consider" the required utilization consideration in its report. As such, on appeal to this Court NHC does not challenge the relative weight the Division may have given utilization issues vis-à-vis the other statutory factors or the underpinnings of its ultimate conclusions. Rather, it merely asserts that the Division committed error by *failing to even consider* utilization in rendering its report. So long as the Division considered utilization as set forth in Code § 32.1-102.3(B)(5) at all, NHC cannot prevail on this assignment of error as stated.

Our review of whether the Division considered the statutory criteria begins with the "presumption that public officials have acted correctly." Hladys v. Commonwealth, 235 Va. 145, 148, 366 S.E.2d 98, 100 (1988). Additionally, we note that the Division explicitly asserted in the staff report that its recommendation was based on a finding that the project complied "with the relevant criteria/standards of the State Medical Facilities Plan and the 8 Required Considerations of the Code of Virginia," which, of course, includes the utilization consideration specified in Code § 32.1-102.3(B)(5).

Despite the presumption of correctness and the Division's explicit statement to the contrary, NHC asserts that the Division "completely ignored—indeed, did not even mention— the utilization and occupancy rates of existing facilities in the Service Area." The record belies this assertion.

The very first page of the Division's staff report contains Table 1, a table detailing the occupancy rates for relevant facilities within Planning District 3. By definition, this table provides occupancy rates for nursing homes located within the area to be served by HCP's

- 19 -

proposed facility.[8]  The table includes the occupancy rates for Abingdon Health & Rehab Center,

Grace Healthcare of Abingdon, and NHC, the three entities that initially sought good cause

standing and that operate facilities in the service area of HCP's proposed facility.  Furthermore,

the Division staff had before it the objections, mostly on utilization grounds, of competing

facilities within the area to be served.  The Division staff report summarizes some of the

objections received from these competitors, including:

> the potentially negative effect the proposed project could have
> moving to within 9 miles of NHC HealthCare, Bristol.
> Representatives from NHC also highlighted that Abington Health
> [&] Rehab recently opened in their market and is currently in the
> fill up stage.  The administrator of Abington Health & Rehab
> Center also submitted a letter of opposition calling the proposed
> project "unwarranted and would likely threaten the ability of
> current providers in Virginia (and likely Tennessee) to achieve
> health occupancy rates and obtain adequate qualified staff."

Clearly, when drafting the staff report, the Division was aware of both the historical utilization

data and the objections from competitors within the area to be served.

Additionally, the Division's staff report contains additional information related to

considering the new facility's "relationship . . . to the existing health care system of the area to

be served, including the utilization and efficiency of existing . . . facilities . . . ."  Code

§ 32.1-102.3(B)(5).  The Division's staff report makes clear that the Division considered not

---

[8] Based on the record provided by NHC, NHC has not been consistent in whether the required utilization review is limited to facilities within thirty minutes of the proposed facility or includes the Planning District as a whole.  In its reply brief in this Court, NHC asserts that the review could not be done regarding the entire Planning District, but rather, was required to focus on "the need for additional nursing home beds within a discrete geographic sub-area such as Bristol/Washington County, the proposed Service Area for the project."  According to the transcript of the proceedings in the circuit court, NHC took the opposite position, arguing that the Division was "required to consider *all of the utilization in the planning district.  That was not done.*"  (Emphasis added).  Regardless, Table 1 of the Division's staff report and other portions of the report demonstrate that the Division considered the utilization rates of facilities throughout the Planning District, including the rates at existing facilities located within 30 minutes of the proposed facility.

only historical utilization, but future needs as well.[9]  Acknowledging the population imbalance that HCP had noted within the district, *i.e.*, that the nursing home age population of Planning District 3 was more heavily concentrated where the proposed facility was being built than where the beds were to be delicensed, the Division noted that HCP's proposed facility would "respond to existing and projected patient demand . . . ."

Ultimately, the Division concluded that "[t]he proposed project is not likely to have a significant negative impact on the *utilization, cost, or charges of other P[lanning] D[istrict] 3 providers of nursing home care*."  (Emphasis added).  By definition, this conclusion includes facilities within the sub-area identified by NHC, including NHC itself.

Given the foregoing, it is clear that the Division *considered* "[t]he relationship of the project to the existing health care system of the area to be served, including the utilization and efficiency of existing services or facilities . . . ."  Code § 32.1-102.3(B)(5).  Thus, the Division staff report did not contain a substantial material error of law as alleged by NHC, and therefore, the Commissioner did not err in concluding that NHC had failed to establish that it was entitled to good cause standing.  Accordingly, the circuit court did not err in affirming the Commissioner's decision in this regard.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court affirming the Commissioner's denial of NHC's petition seeking good cause standing status.

Affirmed.

---

[9]Considering future demand and utilization is consistent with the guiding principles for project review criteria set forth in the COPN regulations.  See 12 VAC 5-230-30(4) ("The COPN program seeks to encourage the conversion of facilities to new and efficient uses and *the reallocation of resources to meet evolving community needs*." (emphasis added)).